**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

**CC MONROE,**

Plaintiff,

v.

**THE CITY OF NEW YORK, SOMA 25 WATER STREET, GFP REAL ESTATE, BLUE OWL CAPITAL, ASSOCIA, CHOICE NY MANAGEMENT, RESIDE NEW YORK, MICHAEL FELDMAN, LOFT MANAGEMENT, JACKIE BRUNCAJ, DANA GUYET, SETTLEMENT HOUSING FUND, LIV MANAGEMENT, HILDA ARCANGEL, RISEBORO, JC AUTO BODY INC., AND JOHN DOES 1-10,**

Defendants.

**Case No. 1:25-cv-10260-LTS**

**THIRD VERIFIED AMENDED COMPLAINT (JURY TRIAL DEMANDED)**

## I. PRELIMINARY STATEMENT

1. This is a landmark civil rights action seeking $1,000,000,000 in damages for a coordinated, multi-year campaign of systemic housing discrimination, constructive eviction, **tax fraud,** physical, psychological, and psychological torture.
2. Plaintiff alleges that Defendants have **weaponized environmental stressors, structural deficiencies, physical acoustic battery, and municipal administrative systems to explicitly manufacture and exploit mental health injuries on Black individuals and protected classes for corporate profit**, thereby depriving Plaintiff of health, professional livelihood, and civil rights.
3. This action is brought to address **egregious violations** of the **Fair Housing Act (FHA), the Americans with Disabilities Act (ADA), the Violence Against Women Act (VAWA), the Racketeer Influenced and Corrupt Organizations Act (RICO), and the New York False Claims Act.**

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to **28 U.S.C. §§ 1331 and 1343,** as this action arises under **42 U.S.C. § 1983**, the FHA, the ADA, VAWA, and RICO **(18 U.S.C. § 1961 et seq.).**

5. Venue is proper in the Southern District of New York pursuant to **28 U.S.C. § 1391(b).**

## III. PARTIES

6. Plaintiff CC MONROE is an adult resident of New York, a professional multidisciplinary artist, and a recipient of CityFHEPS housing assistance with documented disabilities (C-PTSD/ADHD) and VAWA protected status.

7. Defendant THE CITY OF NEW YORK is a municipal corporation responsible for the Human Resources Administration (HRA), Department of Homeless Services (DHS), Department of Environmental Protection (DEP), the NYPD, as well as the administration of HOUSING CONNECT and the AFFORDABLE HOUSING LOTTERY. Plaintiff alleges these housing portals operate not as equitable, randomized selection processes, but rather as fraudulent administrative mechanisms utilized to deliberately steer, segregate, and entrap affordable housing recipients.

Upon information and belief, the systemic irregularities within these municipal lottery platforms are currently subject to broader legal and public scrutiny regarding their facilitation of discriminatory steering and landlord tax fraud.

8. Defendants BLUE OWL CAPITAL and ASSOCIA provide the financial and administrative infrastructure for the housing operations and Prop-Tech surveillance in question.

9. Defendants CHOICE NY MANAGEMENT and CEO MICHAEL FELDMAN managed the initial Brooklyn phase of the constructive eviction.

10. Defendants SOMA 25 WATER STREET, GFP REAL ESTATE, LOFT MANAGEMENT, and JACKIE BRUNCAJ (General Manager) manage the ongoing Manhattan phase of the constructive eviction.

11. Defendant LIV MANAGEMENT operates as a third-party "experience coordination team," functioning as the on-site enforcement arm to conduct harassment, intimidation, and enforce racial and economic segregation.

12. Defendant RESIDE NEW YORK acted as the placement broker. Defendant SETTLEMENT HOUSING FUND (SHF) acted to obstruct Plaintiff's emergency relocation.

13. Defendant RISEBORO (a/k/a Homeboro) is a contracted community partnership agency. Defendant HILDA ARCANGEL acted as Plaintiff's caseworker. Defendant DANA GUYET is an Executive Director at the HRA.

14. Defendant JC AUTO BODY INC. and associated unnamed commercial auto and motorcycle garages (JOHN DOES 1-10) operate as coordinated agents of the enterprise, utilizing their commercial premises to stage vehicles for acoustic battery and executing extreme blockbusting tactics to force gentrification and rezoning.

**IV. STATEMENT OF FACTS**

**A. Phase I: Shelter Steering, Staff Abuse, and Brooklyn (393 Weirfield St)**

15. In 2023, while in the DHS shelter system, Plaintiff was subjected to systemic racial steering and abuse. Shelter staff engaged in administrative harassment and orchestrated involuntary "fight clubs"—deliberately pairing incompatible residents to incite violence for staff

entertainment. During this mandatory shelter period required to obtain housing grants and housing search (March-December 2023) shelter staff explicitly stated that Manhattan was "not for Black people," and that “they don’t want blacks in Manhattan” actively steering Plaintiff into transit-starved areas.

Crucially, **Plaintiff formally applied for ADA Reasonable Accommodations while still residing in the DHS shelter system.** Therefore, **the HRA possessed actual, prior knowledge of Plaintiff’s pre-existing PTSD and severe noise sensitivities *before* placing Plaintiff at 393 Weirfield Street.**

**By deliberately placing Plaintiff in an environment defined by continuous acoustic kinetic shockwaves, Defendants intentionally exploited Plaintiff’s known vulnerabilities, weaponizing the motorcycle violence to exacerbate Plaintiff's condition from PTSD to Complex Post-Traumatic Stress Disorder (C-PTSD).**

Prior to this placement, Plaintiff had overcome previous homelessness (a condition caused directly by extreme physical domestic violence) to build a dedicated fanbase and a public platform as an artist, musician, DJ, writer, performer and outspoken social speaker.

Defendants’ calculated placement and subsequent harassment were designed not only to maximize profit via constructive eviction, but were executed with malice to intentionally sabotage this progress and destroy Plaintiff's public platform, creative identity, and career opportunity, effectively attempting to trap the Plaintiff into a cycle of violence and poverty primarily for profit with **a high possibility that these hate crimes were also racially and/or politically motivated,** ensuring complete career assassination and destruction of opportunity for the Plaintiff.

16. Between late 2023 and January 2024, Plaintiff was placed via affordable housing lottery at 393 Weirfield Street. **The HRA intentionally failed to issue a legally required utility allowance for this address, initiating a pattern of financial sabotage from the inception of the tenancy to promote constructive eviction.**

17. Upon move-in, Plaintiff was immediately subjected to continuous acoustic battery. Defendant JC Auto Body Inc. and adjacent commercial garages and lots actively colluded with the City and property management, staging hundreds of modified vehicles and motorcycles and employing a local motorcycle club (The Forbidden Ones MC) to generate physical kinetic shockwaves. This acoustic intrusion occurred continuously on a 24-hour basis, **operating far beyond normal traffic noise and in gross excess of New York City noise code allowances.**

18. This interference was supported by neighboring occupants acting in concert with Defendants, who engaged in a pattern of targeted acoustic disruptions, specifically slamming doors and banging walls precisely when Plaintiff attempted hygiene or sleep, eventually escalating to 24-hour blasting of music and television inside of the residence simultaneously from multiple sources both inside and outside of the residence to prevent Plaintiff from working or resting.

**B. Physiological Collapse, Off-Premises Stalking, and Witness Intimidation**

19. Within six weeks of tenancy, **documented email correspondence confirms Plaintiff became physically ill from the extreme noise exposure.** Within three months, the acoustic shock and battery caused severe **physiological manifestations, including heart palpitations, cardiac episodes, frequent panic attacks, and migraines.**

**By 2025, this continuous physical and psychological torture culminated in a diagnosis of Complex Post-Traumatic Stress Disorder (C-PTSD) and Stage 3 and 4 physical exhaustion.**

20. Defendants' agents aggressively stalked Plaintiff to the building gym.

Notably, this gym membership was fully covered as an amenity fee by the HRA, directly contradicting the **HRA's later fraudulent claim that they "do not cover amenity fees"** at 25 Water Street.

In order to promote the constructive eviction, third parties acting on behalf of the Defendants engaged in **targeted intimidation at this building gym** (located across the street at 372 Weirfield) by **violently screaming, yelling, and throwing heavy weights to intentionally trigger Plaintiff's stress and panic attacks.** This specific, targeted trauma eventually (after months of attacks and abuse, detailed in the Plaintiff's audio and video recordings from 2024) necessitated Plaintiff's purchase of a stationary Peloton bike to maintain health and wellness in private, causing the Defendants to aggressively and violently escalate the harassment to target and attack the Plaintiff while attempting to remain safe and well inside of the building, targeting the Plaintiff's health, sleep, and daily routines, including intentional interception of work activities within the residence.

21. When Plaintiff sought medical treatment for these physical and stress-related injuries, **Defendants' agents—operating motorcycles—actively stalked Plaintiff to the doctor's office, bank, and grocery store on a regular basis.**

**Defendants utilized Plaintiff's limited on-foot mobility to intimidate Plaintiff using excessive and violent force on the ground level, constituting a form of physical assault and battery.**

This conduct constitutes explicit **witness intimidation** and **retaliation** intended to sever Plaintiff from medical care and suppress legal documentation.

NYPD continuously refused to take reports via 311 and 911 regarding numerous incidents, including verbal harassment, vehicular assault and physical intimidation inside the residence and at the street level outside between the auto shops and motorcycle garages.

22. Despite an estimated 600 formal reports to 311 and 911 between 2024 and 2025, the NYPD and DEP deliberately failed to enforce noise codes or laws pertaining to illegally modified vehicles, large motorcycle engines, ATVs, dirtbikes, commercial noise, and commercial generator use.

This immunity was secured by Defendant Michael Feldman's professional relationship as an "Expert Witness" for the Manhattan District Attorney, creating a policy of deliberate indifference and **ultimately making it impossible to seek recourse in housing court or at the Supreme Court level.**

Coordination between **multiple businesses** in the direct and surrounding area utilized to create extreme noise and disruptions of peace on a 24-hour basis is collusive with the City of New York rapid rezoning and gentrification initiatives and is financially motivated.

**C. Unauthorized Entry, Spoliation of Evidence, and VAWA Interference**

23. Upon initiating federal inquiries to secure a VAWA Emergency Transfer, Defendants executed **coordinated sabotage** and **evidence destruction**.

During Plaintiff's relocation process, Defendants' agents executed an **unauthorized entry into Plaintiff's unit at 393 Weirfield Street.** Physical evidence recovered from the residence implies that intruders actively searched Plaintiff's furniture and other belongings with the intention of

locating and destroying all audio and video evidence (kept on flash drives and external hard drives) collected over a two-year period. The intruders left an acrylic nail embedded in the couch cushions and executed an unauthorized factory reset on Plaintiff's computer to wipe the hard drive and destroy electronically stored information (ESI) relevant to this litigation.

24. Previously, in December 2025, active tampering occurred within Plaintiff's ACCESS HRA digital portal (Case #00039134471A). Plaintiff's active CityFHEPS voucher documentation was intentionally "hidden."

25. To manufacture non-compliance, the HRA issued impossible deadlines set for Sunday, December 21, 2025—a non-business day—triggering an automatic "Failure to Comply" status. This forced Plaintiff to apply repeatedly, with the HRA continually denying requests for support even after Plaintiff completed multiple interviews, met all requirements, and submitted required documentation in a timely manner. Defendants Reside New York and Settlement Housing Fund initially utilized this manufactured administrative glitch and the holiday closure to unlawfully deny Plaintiff's housing transfer.

**D. Phase II: Manhattan, ADA Denials, and Retaliation (25 Water St)**

26. Plaintiff was subsequently subjected to retaliatory placement. Reside New York and HRA caseworkers knowingly placed Plaintiff in a unit at 25 Water Street that lacked necessary ADA and VAWA sound-attenuation protections. Defendants intentionally assigned Plaintiff to a unit adjacent to Unit 1613, which houses a persistently barking dog (constantly emitting a high pitched yapping, barking and squealing nearly <u>indecipherable</u> from that of a fire detector dead battery warning).

The structural insufficiency efficiently allows spoken word and verbal conversations at even a murmured volume to be heard clearly through the demising walls on either side of the

apartment, and therefore the sound of the barking dog or the targeted statements from 1611 is indecipherable audibly from being inside of the apartment itself and is therefore unsuitable. There is absolutely no sound insulation between apartments, a violation of the New York Building and Fire Code.

**This placement is a retaliatory action specifically intended to exploit Plaintiff's disclosed medical vulnerabilities after multiple attempts to request a remedy and solution under VAWA, ADA and FHA.**

27. Prior to official relocation, during the application and selection process, Plaintiff submitted formal written requests for medical Reasonable Accommodations under the ADA and FHA to Defendants SoMA and GFP, previously having sent medical documentation through RESIDE requesting relocation to a quiet unit or the installation of adequate sound attenuation.

Defendants, including General Manager Jackie Bruncaj, denied these requests in writing and unlawfully refused to engage in the interactive process.

Plaintiff provided documentation detailing that impulsive shocks, booms, bangs, and slams—as well as non-ambient, excessive noise—**consistently sabotage efforts to recover from the disability caused by the previous landlord.**

These multimillion-dollar corporations have attacked the health and wellness of vulnerable citizens for profit, further exacerbating Plaintiff's disabilities.

Despite Plaintiff sending a formal notice of harm and repeatedly requesting Reasonable Accommodations under the ADA, FHA, and VAWA, these requests were denied through explicit written correspondence, a refusal to remedy, and administrative silence. Furthermore, **escalating retaliatory actions and intimidation efforts have continued in direct response to these good-faith requests.**

28. Immediately after Plaintiff asserted in writing that these denials violated federal law, Defendants escalated the retaliation. Management instructed staff to harass, stalk and monitor Plaintiff in the gym and amenity spaces during Plaintiff's daily scheduled fitness, and recovery routines as well as professional and work activities, as well as throw away, hide and move mail received, forcing interactions to manufacture hostility as a defense in retaliation for the good faith ADA requests and resulting legal fallout. Managers actively and on multiple occasions followed Plaintiff into these areas to intercept progress by exploiting Plaintiff's known medical conditions.

**<u>This mirrors the exact pattern of violence used at the previous residence,</u> proving a coordinated system of harassment, displacement, and violence toward affordable housing tenants in both private residences and public spaces by multiple luxury landlords benefiting from tax abatement programs, a citywide practice of corruption, racial violence and hierarchical segregation which attacks the physical and mental health, wellness, livelihood, economic vitality and functionality of affordable housing recipients.**

29. The demising walls and ventilation assembly provide inadequate acoustic separation **(STC < 50)**. This allows the occupant of Unit 1611 to clearly assert racially charged and political statements **<u>through the wall</u>** directed to intimidate target, or trigger Plaintiff–to clearly verbally assert racially and hate fueled political affiliations and directed hate speech by speaking clearly through the vents or through the walls, and to whistle through ventilation shafts and actively monitor and harass Plaintiff during private activities **<u>in the restroom.</u>**

This is also multiple health, life and fire code violations.

The demising walls and ventilation assembly provide inadequate acoustic separation (STC < 50), **which constitutes a direct violation of the New York City Building Code and Fire Code.**

**Under these codes, wall assemblies between residential units must maintain a Sound Transmission Class (STC) of at least 50 to ensure structural integrity and fire containment.**

The fact that normal conversation and targeted verbal harassment are clearly audible through these walls serves as material evidence that the partitions are structurally deficient.

**This lack of acoustic separation indicates a failure of the fire-rated assembly, meaning the units are not fire-safe and do not provide the legally mandated barrier to smoke and flame. Consequently, Defendants are knowingly maintaining a premises that constitutes multiple health, life-safety, and fire code violations.**

**E. Racial Clustering, Surveillance, and LIV Management**

30. Defendants engage in the unlawful racial and economic clustering of Black and affordable housing tenants into **segregated zones within the building.**

31. Defendant LIV MANAGEMENT and building staff are **explicitly trained and directed to identify apartments housing affordable housing recipients, subjecting minority and CityFHEPS tenants to systemic racism, abuse, and hyper-surveillance.**

32. LIV MANAGEMENT personnel actively stalk and monitor Plaintiff, f**ollowing Plaintiff into amenity spaces to orchestrate intimidation and psychological attrition during work.**

**F. Administrative Segregation and Disparate Impact**

33. On April 15, 2026, Defendant SoMA instituted a directive forcing affordable housing tenants on floors 2 through 22 to exclusively use the "B Bank" of elevators, while reserving the "A Bank" for market-rate tenants on floor 25 and above.

34. This creates a quantifiable **disparate service impact**, mandating 1,170 affordable housing tenants to use four elevators (292.5 units per elevator) while 130 market-rate tenants utilize an equal number of elevators (32.5 units per elevator). The culture and practice of racism at 25 Water Street by staff at the administrative level is a coordinated attempt to **segregate and separate both class and race at a building utilizing public tax abatements.**

**G. Amenity Exploitation, Fraud, and Financial Sabotage**

35. Defendants charge a mandatory $150 amenity fee, creating extreme disparate impact. Despite the fee legally falling under the CityFHEPS maximum rent cap, Defendant Hilda Arcangel (Riseboro), acting **under explicit instruction** from Defendant Dana Guyet (HRA), purposefully **omitted** the $150 fee from the HRA paperwork prior to submission.

36. In furtherance of this fraud, Defendant Arcangel sent Plaintiff isolated signature pages, attempting to coerce Plaintiff into signing legally binding documents without disclosing the altered terms. Arcangel then maliciously closed the case after issuing multiple, deliberate denials of Plaintiff's moving funds.

37. This targeted financial deprivation unlawfully stranded Plaintiff's personal property and essential physical rehabilitation equipment—specifically the stationary Peloton bike purchased to escape the Brooklyn gym harassment—at the previous residence with a majority of the Plaintiff's personal belongings.

**This calculated sabotage strips Plaintiff of medical autonomy, intentionally forcing Plaintiff to only rely on the Manhattan building's public fitness center.**

38. Within this facility, Defendants' agents execute **the exact same coordinated gym harassment program** previously deployed at 393 Weirfield Street, proving the existence of an interconnected enterprise and **general practice among luxury landlords targeting affordable housing recipients.** Third parties on the Defendant's behalf, in addition to or including building staff and LIV Management coordinate impulsive noise attacks and proximal harassment by intentionally **slamming heavy weights directly behind Plaintiff during gym training** and staging attacks during sauna recovery, as well as leading guided tours through the area on a consistent basis, creating a general violation of privacy and the disturbance of peace.

**This harassment is maliciously timed to engage when Plaintiff's back is turned to violently trigger the maximum effect of extreme banging, ground-shaking rumbles, and panic-inducing noise** in order to effectively intercept recovery from two years of extreme acoustic battery from motorcycles and illegally modified vehicles at the previous residence **These are not normal gym sounds;** they are non-contact attacks staged by team members of LIV Management acting under the direction of SoMA Management to purposefully trigger Plaintiff's C-PTSD and increased in escalation after requests for ADA and FHA compliance under VAWA.

39. While charging the amenity fee, **Defendants utilize these spaces as commercial showrooms on a daily basis.**

Marketing tours are continuously conducted through pools and saunas **while residents are in states of undress or recovery.**

40. Defendants frequently close designated amenity spaces for maintenance without providing any abatement of the mandatory fee, or a timeline for repair.

**Segregation and racial hostility are physically enforced within the building architecture,** where **even basic sitting areas** are restricted by **one, two, and sometimes three separate key-fob entry barriers** designed to exclude affordable housing tenants.

**H. The Tax Fraud and Churning Scheme (N.Y. State Fin. Law § 187)**

41. Defendants GFP REAL ESTATE, SOMA 25 WATER STREET, and BLUE OWL CAPITAL have engaged in a systemic "Tenant Churning" enterprise to defraud the City and State of New York.

42. Defendants applied for and received lucrative 35-year property tax abatements (pursuant to RPTL **§ 421-a and § 467-m**) by falsely certifying they would provide stable affordable and **equal** housing.

43. While Defendants benefit financially a 35-year tax exemption, the average CityFHEPS grant is generally strictly limited to 5 years.

**Defendants have intentionally deployed these constructive eviction tactics throughout the entire duration of Plaintiff's housing grant.**

Plaintiff is currently in year three of a five-year grant and has been subjected to a coordinated attack for the duration of this period. While native New Yorkers have characterized such treatment as "normal" for FHEPS and CityFHEPS recipients, Plaintiff alleges this reflects a **pervasive municipal culture and practice of systematically attacking, harassing, and torturing affordable housing recipients.**

By weaponizing the finite nature of Plaintiff's housing subsidy, Defendants aim to ensure Plaintiff's five-year term is defined by unceasing humiliation, physical and mental illness created directly from the abuse, hostility and exhaustion, f**acilitating Plaintiff's displacement and**

**ultimately trapping the Plaintiff in a state of perpetual homelessness and poverty for corporate gain.**

By subjecting Plaintiff to continuous torture for the entirety of the grant's duration, Defendants aim to eliminate the affordable units and rapidly turn over the tenants, retaining the tax abatement while inflating the building's market value.

44. This constitutes a "Reverse False Claim" under **N.Y. State Fin. Law § 189(1)(h)** and a predicate act of **Mail and Wire Fraud under the RICO statute.**

**V. THE DESTRUCTION OF CREATIVE CAPACITY AND HUMAN POTENTIAL**

45. As a multidisciplinary artist and producer, Plaintiff's residence was **intended** to function as a professional production studio and office, as well as a recovery space and sanctuary from the elements, after years of trauma and extreme hardship.

By intentionally manipulating the acoustic environment, **Defendants have caused severe impairment to Plaintiff's nervous system and biological function.**

46. The sustained environmental distress has resulted in **vocal constriction due to nervous system damage** and **physical injury from extreme stage four exhaustion,** preventing Plaintiff from performing the necessary vocal work required for established music, writing, and multimedia projects, **a career trajectory which was heavily altered by these events.**

Defendants' current active harassment, intimidation, retaliation, stalking and monitoring within both the unit and the "private" amenity spaces constitutes direct **tortious interference with prospective economic advantage** by **both** landlord defendants and the City of New York via HRA.

47. **This coordinated interference has resulted in a severe loss of professional agency and the destruction of career potential and earning capacity.**

**VI. CAUSES OF ACTION**

48. **Count I:** Violation of **42 U.S.C. § 1983** (Monell Claim) – Custom of Deliberate Indifference and Denial of Equal Protection.

49. **Count II:** Violation of the Fair Housing Act – Disparate Impact, Racial Clustering/Segregation, and Retaliation.

50. **Count III:** Violation of the Americans with Disabilities Act and Violence Against Women Act – Written Denial of Reasonable Accommodations, Failure to Engage in the Interactive Process, and Retaliation.

51. **Count IV:** Civil RICO **(18 U.S.C. § 1962) –** Pattern of Racketeering, Extortion, Fraud, Witness Intimidation, and Constructive Eviction.

52. **Count V:** Violation of the New York False Claims Act **(N.Y. State Fin. Law § 187 et seq.)** – Reverse False Claims and Tax Fraud.

53. **Count VI: Aggravated Intentional Infliction of Emotional Distress –** Exploitation and **deliberate creation** of mental health injuries for corporate profit.

54. **Count VII:** Tortious Interference with Prospective Economic Advantage.

55. **Count VIII:** Battery/Physical Assault – Use of kinetic physical force (physical sonic and acoustic shockwaves) to cause bodily physiological injury.

56. **Count IX:** Spoliation of Evidence – Active tampering with digital records and unauthorized physical destruction of ESI.

57. **Count X:** Coordinated Psychological Attrition and Stalking.

58. **Count XI:** Obstruction of Mitigation and Administrative Harassment.

59. **Count XII:** Predatory Attrition.

60. **Count XIII:** The Tort of Interference with Creative Potential.

**VII. PRAYER FOR RELIEF**

61. Plaintiff respectfully demands a **JURY TRIAL** and judgment against all Defendants as follows:

a. **Compensatory Damages** in the amount of **$500,000,000** for the permanent impact on health, loss of career, loss of creative capacity, and years of physical and psychological injury;

b. **Punitive Damages** in the amount of **$500,000,000** to punish the Defendants for their discriminatory conduct and to deter such civil rights violations in the future;

c. A total judgment of **$1,000,000,000 (One Billion Dollars)**;

d. Statutory damages as permitted by law; e. Any other relief the Court deems just and proper.

**VERIFICATION**

I, **CC MONROE**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct: I am the Plaintiff in the above-captioned action. I have read the foregoing **Verified Third Amended Complaint** and know the contents thereof. The factual allegations contained therein are true to my own knowledge, except as to those matters stated to be alleged upon information and belief, and as to those matters, I believe them to be true. I

understand that any false statements made herein are punishable under the laws of the United States of America.

**Executed on April 16, 2026.**

Respectfully submitted,

**CC MONROE** Plaintiff Pro Se

CC MONROE

Plaintiff, *Pro Se*

ccsamonroe@gmail.com

25 Water Street

New York, New York 10004